**HODELL–NATCO INDUSTRIES, INC., Plaintiff,**

v.

**SAP AMERICA, INC., et al., Defendants.**

**Case No. 1:08–cv–02755.**

United States District Court, N.D. Ohio, Eastern Division.

Signed March 31, 2014.

---

James F. Koehler, P. Wesley Lambert, Timothy John Fitzgerald, Koehler Neal, Cleveland, OH, for Plaintiff.

Charles W. Zepp, Hugh E. McKay, Leo M. Spellacy, Jr., Porter, Wright, Morris & Arthur, Cleveland, OH, Gregory J. Star, Joseph M. Kelleher, Macavan A. Baird, Michael John Miller, Thomas S. Downie, Drinker Biddle & Reath, Philadelphia, PA, Rafael P. McLaughlin, Roy A. Hulme, Reminger & Reminger, Cleveland, OH, for Defendants.

### MEMORANDUM OF OPINION AND ORDER

LESLEY WELLS, District Judge.

This matter comes before the Court on defendants SAP and SAP AG's (collective-

ly, "SAP") objections to United States Magistrate Judge Greg White's recommendation that SAP's motion for summary judgment be denied. (Doc. 187). Also before the Court are defendants LSi–Lowery Systems, Inc. and the IBIS Group, Inc.'s (collectively "LSi–IBIS") objections to the Magistrate Judge's recommendation that LSi–IBIS's motion for summary judgment be granted in part and denied in part. (Doc. 188). The plaintiff Hodell–Natco Industries, Inc. ("Hodell") has responded to both sets of objections. (Doc. 190, 191). For the reasons that follow, the Court will overrule the objections and accept the Magistrate Judge's recommendations. Thus, SAP's motion for summary judgment will be denied, and LSi/IBIS's motion will be granted in part and denied in part.

## I. Standard of Review

This Court makes "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." Local Rule 72.3(b). The failure by either party to file specific objections constitutes a waiver of the right to appeal the Magistrate Judge's recommendations. *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508–09 (6th Cir.1991). As such, except where clearly erroneous, any finding or recommendation of the Magistrate Judge to which the parties do not timely object is accepted by this Court.

**1.** According to the First Amended Complaint, a "Channel Partner," also known as a "value added reseller," refers to an entity authorized

## II. Background

Plaintiff Hodell is a wholesaler of fastener and chain products. (Doc. 26, ¶ 9). Prior to the events of this suit, Hodell had been using a software product called FACTS in combination with two add-on software products, In–Flight and Radio Beacon. These software products provided invoicing, billing, and accounting functions for Hodell's business. (Doc. 105–9, p. 28; Doc. 105–7, 14–20; Doc. 105–38, pp. 10–12). Defendant IBIS was providing software support to Hodell in relation to the FACTS system. In 2003, Hodell considered replacing FACTS with a newer, scalable product that would provide it integrated financial and sales management capabilities. (Doc. 110–4, p. 7, 8). It was important to Hodell that the software be capable of accommodating its eighty then-existing users, with room for growth up to three-hundred users. (Doc. 26, ¶ 34; Doc. 110–4, p. 7).

In early 2003, Hodell's CEO Otto Reidl attended a conference in Cleveland, Ohio, where he learned about software called Business One. (Doc. 105–37, p. 11). The software was developed by defendant SAP AG, and it is distributed and licensed by defendant SAP America. At that time, non-party American Express was a Channel Partner [1] of SAP. Following the conference, American Express contacted Hodell with an offer to sell Business One. (Doc. 105–37, p. 11). Hodell was provided with marketing materials about Business One, which included:

> The SAP Business One Brief, which represents that Business One "helps emerging businesses, from those with 10 to several hundred employees, to streamline their operational and managerial processes." (Doc. 26, ¶ 18; Doc. 26–1)

to market, resell, implement, and service the SAP Business One product. (Doc. 26, ¶ 13).

An email representing that Business One is a "seamlessly integrated solution with all the functionality necessary to run a small or mid-sized business." (Doc. 105–37, pp. 25–26; Doc. 26–2).

The SAP Business One White Paper, which represented that SAP Business One was meant for small and medium-sized businesses and that it supports "an unlimited number of simultaneous user transactions." (Doc. 26–3).

On 20 October 2003, Mr. Reidl participated in an online webinar about Business One presented by SAP and American Express. (Doc. 105–37, p. 30). Mr. Reidl in turn discussed the product with Dale Van Leeuwen of Defendant IBIS. (Doc. 105–7, pp. 14–15). Mr. Van Leeuwen was intrigued and he contacted Dan Lowery of Defendant LSi–Lowery. (Doc. 105–7, pp. 15–16). Both Van Leeuwen and Lowery were looking for the next technology beyond FACTS, and because Business One looked like a promising option within their market, they discussed joining forces and becoming an SAP Channel Partner. (Doc. 105–7, pp. 13–16, 17). According to Mr. Van Leeuwen, he met with SAP personnel to determine whether Business One would be a good fit for Hodell. (Doc. 105–7, pp. 16–17, 18–20, 38–40). At some point thereafter, Van Leeuwen and Lowery became Channel Partners of SAP to sell and develop add-ons to Business One. (Doc. 105–9, pp. 5–7).

On 3 December 2003, Mr. Reidl participated in a phone conference with American Express, Mr. Van Leeuwen, and Mr. Lowery. (Doc. 155–82, pp. 7–8). According to Mr. Reidl, during this conference he was assured that Business One would support up to 500 users. (Doc. 155–82, p. 8). It was Mr. Reidl's belief that both American Express and Mr. Van Leeuwen were representing SAP. (Doc. 155–82, p. 8). Hodell contends that throughout 2004, it received additional assurances from SAP, through its Channel Partners, that Business One would support Hodell's needs. (See Doc. 155, pp. 9–10). Based on these assurances, Hodell decided to replace FACTS with Business One. However, Hodell was also aware from the start that for Business One to fulfill all its needs, two add-ons were required. (Doc. 110–3, p. 16(160)). Hodell planned to use the add-ons it was already using with the FACTS based system, namely, Radio Beacon for warehousing functions and In–Flight for inventory management functions. These add-ons were to be coded from scratch in order to work with Business One. (Doc. 105–9, pp. 4–5). SAP authorized LSi/IBIS to develop them for use with Business One. (Doc. 105–9, pp. 14–16).

On 20 December 2004, Hodell and LSi/IBIS executed a Development Agreement, which called for Hodell to order eighty user licenses of SAP's Business One software at a cost of $300,000. (Doc. 26, ¶¶ 30–32). The agreement also called for LSi/IBIS to develop the software add-ons, eventually known as In–Flight Enterprise, for Business One. (Doc. 26, ¶ 75). The development period lasted over two years, during which time the code was written and the software was tested. On 23 December 2005, Hodell entered into a second agreement-the License Agreement-pursuant to which it agreed to purchase an additional 40 user licenses from IBIS. (Doc. 26, ¶ 46). According to SAP, the License Agreement provided a performance warranty to Hodell; disclaimed all prior representations and implied warranties; and limited SAP's liability in the event the software did not meet the performance warranty. (Doc. 110–1, p. 12).

During this time, multiple "live stress tests" were performed on the software as it was being developed. (Doc. 105–36, pp. 9–15; Doc. 105–35, pp. 3–7). The stress

tests were performed on Hodell's computers, using Hodell's data, in the manner that Hodell would run its day-to-day business. (*Id.*). By early 2007, LSi/IBIS and Hodell agreed that the software was testing well enough that it was ready to "go live." (Doc. 105–37, p. 42; Doc. 105–39, pp. 3–5). The program went live in March 2007, but problems were immediately apparent. According to Hodell, "[t]he system responded so slowly that Hodell–Natco's sales force was unable to reasonably respond to customer inquiries by telephone." (Doc. 26, ¶ 49). The system suffered from numerous other issues, including In–Flight disconnect errors; data synchronization errors between Business One and Radio Beacon; ongoing discrepancies between package-on-hand and warehouse-on-hand figures, among others. (*Id.*). According to Hodell, the software never performed adequately and after two years of "limping along," they scrapped it. (Doc. 110–4, p. 10 (sub 147)). Hodell maintains that it spent over a million dollars for replacement software.

### III. Procedure

On 21 November 2008, Hodell brought this lawsuit, and on 22 April 2009, it filed a five count Amended Complaint against SAP America, Inc, SAP AG, LSi–Lowery Systems, Inc., and the IBIS Group. (Doc. 26). Hodell brings claims of (1) Fraudulent Inducement; (2) Fraud; (3) Breach of Contract; (4) Negligence; and (5) Negligent Misrepresentation. On 18 May 2009, LSi and IBIS filed a joint answer.[2] (Doc. 30). Hodell claims that Business One never functioned as promised; that the software was sold on the false premise that it could support its growing user require-ments; and that the defendants knew this premise to be false.

On 1 June 2009, the SAP defendants filed a motion to dismiss the Amended Complaint. (Doc. 36). Hodell filed a brief in opposition (Doc. 40), and SAP filed a reply. (Doc. 41). On 8 July 2010, the motion was referred to United States Magistrate Judge Greg White for a report and a recommended decision. (Doc. 46). After hearing oral arguments, the Magistrate Judge issued a Report and Recommendation advising that the motion should be granted in part and denied in part. (Doc. 50). Specifically, it was recommended that the negligence claim and the breach of contract claim, as it related to the Development Agreement, be dismissed as to both SAP defendants. It was recommended that the breach of contract claim, in relation to the License Agreement, be dismissed as to SAP AG only. It was further recommended that the motion be denied as to Hodell's claims of fraud, fraudulent inducement, and negligent misrepresentation. On 2 June 2011, 2011 WL 2174365, this Court adopted the Report and Recommendation over the parties' respective objections. (Doc. 61). The SAP defendants answered the Amended Complaint on 24 June 2011. (Doc. 69).

A case management conference was held on 30 June 2011. (Doc. 71). Discovery commenced. After a number of phone conferences, extensions of case deadlines, and the resolution of a discovery dispute by Magistrate Judge White, LSi/IBIS filed a motion for summary judgment on 6 September 2012. (Doc. 105). On 7 September 2012, the SAP defendants filed for summary judgment (Doc. 110), and Hodell

---

**2.** LSi/IBIS also filed a counterclaim against Hodell and a cross-claim against SAP America, Inc. (Doc. 30). Hodell answered the counterclaim on 21 May 2009. (Doc. 33). On 11 June 2009, SAP AG and SAP America answered LSi/IBIS's cross-claim and filed a cross claim of their own against LSi/IBIS. (Doc. 37). On 16 September 2009, LSi/IBIS answered Hodell's counterclaim and SAP's cross claim. (Doc. 43).

moved for summary judgment on LSi/IBIS's counterclaim (Doc. 109). On 16 November 2012, after the motions were briefed, the case was referred to Magistrate Judge White for Report and Recommendation. (Doc. 170). On 1 February 2013, the parties attended a settlement conference before the Magistrate Judge, which was unsuccessful. (Doc. 175). On 28 February 2013, the parties argued their motions orally before Judge White. (Doc. 178).

On 13 June 2013, the Magistrate Judge issued two R & Rs. In the first, he recommended that the SAP defendants motion for summary judgment be denied. (Doc. 182). In the second, he recommended that LSi/IBIS's motion for summary judgment be granted in part and denied in part. (Doc. 183). Specifically, it was recommended that summary judgment be granted as to Hodell's negligence claim against LSi/IBIS and denied as to all other claims. It was also recommended that Hodell's motion for judgment on the pleadings/motion for summary judgment be denied in its entirety. (Doc. 183). On 22 August 2013, the SAP defendants and LSi/IBIS filed objections, respectively. (Doc. 187, 188). Hodell responded on 22 August 2013. (Doc. 190, 191). Hodell does not object to the recommendation that its motion for summary judgment be denied. That recommendation will accordingly be accepted.

## IV. Summary Judgment Standard

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reason-able inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir.2000) (citing *Northland Ins. Co. v. Guardsman Prods., Inc.*, 141 F.3d 612, 616 (6th Cir.1998)).

## V. Discussion

### A. SAP's Objections

#### 1. Whether the Magistrate Judge Failed to Properly Consider the Evidence

The Magistrate Judge recommended denying SAP's motion for summary judgment with respect to the plaintiff's claims of fraud/fraudulent inducement, negligent misrepresentation, and breach of contract. SAP contends that this conclusion was erroneous, because the Magistrate Judge failed to consider a number of facts that came to light during discovery.

First, SAP states that while Hodell alleges that Business One was never properly implemented, Hodell's president later admitted that Hodell "ran its business" using Business One from March 2007 until April 2009. SAP notes that Hodell was using the software at the time this suit was filed. This argument suggests either that Hodell has conceded that it has not suffered damages or that no representation made by SAP, if any, was false.

In response, Hodell contends that SAP's argument mischaracterizes some facts while ignoring others. While Hodell admits that Business One was *installed* in Hodell's facility for two years, it maintains that the software never functioned as promised. The Court agrees with Hodell that there is sufficient record evidence to show that Business One did not perform as promised. According to Kevin Reidl, Hodell's president, during 2007 the company was "limping along" using workarounds, as a result of Business One's speed and performance issues. (Doc. 141, p. 149; Doc. 142, pp. 129–30). Evidence also exists to

show that LSi admitted that Business One did not perform adequately for Hodell. (Doc. 149, pp. 125–26, 138–39, 159). SAP's Business One sales director admitted the same. (Doc. 137–1, pp. 93–94). Further, in 2007, Business One's lead developer stated, "Someone has sold to the wrong customer, which is WAY above any sane [Business One] sweet spot (120 users!!!), and obviously they are experiencing severe performance issues." (Doc. 155–11, p. 3). And the same developer later stated, "There is not much we can do here.... There is no doubt that this is not a [Business One] customer...." (Doc. 154, p. 122). In the Court's view, SAP's suggestion that Hodell successfully "ran its business" using Business One is belied by the above-cited evidence.

SAP next challenges the Magistrate Judge's conclusion that SAP made representations regarding Business One's capabilities prior to the signing of the 2004 Development Agreement or the 2005 License Agreement. SAP cites the deposition testimony of Otto Reidl which indicates that Hodell never had any direct contact with SAP at any time prior to execution of the 2005 License Agreement. (Doc. 110–3, pp. 198–99). SAP maintains that because Hodell did not receive any representations, promises, advice or guidance from SAP prior to entering either contract, its misrepresentation claims fail as a matter of law.

In the Court's view, notwithstanding Mr. Reidl's testimony, Hodell has provided sufficient evidence to show that prior to the signing of the agreements, SAP otherwise made representations to Hodell directly through its marketing literature. One document, referred to as "The SAP Business One Brief," indicates that Business One "helps emerging business, from those with 10 to several hundred employees." It further states, "Whether you have 5 employees or 500, the solution helps emerging businesses." (Doc. 155–59). SAP's former director of the Business One channel, Daniel Kraus, acknowledged that this literature was intended for prospective customers. (Doc. 137, p. 60). Hodell also provides a document entitled the "SAP Business One White paper" which claims that Business One supports "an unlimited number of simultaneous user transactions." (Doc. 155–77, p. 7). This evidence would support a finding that SAP represented to Hodell that the Business One software could accommodate at least 120 users.

SAP contends that even if the marketing materials could be construed as a misrepresentation on its part, Mr. Reidl admitted that Hodell did not rely on those materials. (See Doc. 129–1, pp. 35 (sub p. 135)). Thus, SAP argues that Hodell cannot satisfy the necessary element of justifiable reliance to support its fraud and misrepresentation claims. The Court disagrees. In addition to these direct representations, the Magistrate Judge cited numerous representations made by SAP's alleged business partners and co-defendants LSi and IBIS, for which Hodell maintains SAP should be liable. There is evidence that LSi/IBIS based its representations on the SAP marketing materials. The Court agrees with the Magistrate Judge's observation that "factual issues remain whether SAP could be found liable through a theory of apparent agency or agency by estoppel." SAP does not provide a convincing argument to the contrary.

SAP also argues that the Magistrate Judge erred by failing to consider other alleged admissions in discovery, including Hodell's CEO Otto Reidl's testimony that at the time the License Agreement was signed, he believed that "SAP knew that [Business One] would not handle [Hodell's needs]." Based on this testimony, SAP

contends that Hodell could not have justifiably relied on any representation made by SAP. Viewing this evidence, as it must, in favor of the non-moving party Hodell, the Court disagrees. Mr. Reidl stated, "It's my belief that by this time SAP knew that [the software] would not handle the number of users.... That's my personal impression." (Doc. 129–1, p. 29 (subp. 109)). A rational trier of fact could reasonably reject SAP's interpretation of this language and conclude that Mr. Reidl was testifying as to SAP's knowledge at the time, not his own. This objection is overruled.

### 2. Fraudulent Inducement

■ In addition to the factual arguments noted above, SAP challenges the Magistrate Judge's legal reasoning with respect to Hodell's claims of fraud and fraudulent inducement. SAP maintains that contrary to the Magistrate Judge's recommendation, Hodell's breach of contract claim forecloses its claims of fraud.

■ Generally, "the existence of a contract action ... excludes the opportunity to present the same case as a tort claim." *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir.1981). A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed. *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 117 (6th Cir.1976). In this instance, the Magistrate Judge concluded that SAP's alleged false promise that Business One would accommodate the required number of users was in breach of a duty separate from the License Agreement.

■ On *de novo* review, it is the Court's opinion that the Magistrate Judge's con-

clusion was not in error. In Ohio, there is a common law duty to refrain from making fraudulent representations to induce a party to enter a contract. *Onyx Envtl. Servs. v. Maison*, 407 F.Supp.2d 874, 879 (N.D.Ohio 2005). The Supreme Court of Ohio has stated that a claim of fraudulent inducement often involves "a misrepresentation of facts outside the contract or other wrongful conduct [inducing] a party to enter into the contract." *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503, 692 N.E.2d 574, 578 (Ohio 1998).

In the present case, there is sufficient evidence to show that SAP, either directly or through agency principles, knowingly misrepresented the capabilities of Business One to induce Hodell to enter the License Agreement, thus breaching a duty collateral to the contract. As set forth in the Report and Recommendation, there are numerous instances of Hodell being informed that Business One was capable of supporting hundreds of users. (*See* Report and Recommendation, Doc. 182, pp. 807–08). There is also ample evidence that this representation was false. Further, as described by the Magistrate Judge, there is evidence by which it might be inferred that those representations were known to be false by the parties making them. (*See* Report and Recommendation, Doc. 182, pp. 808–09).

Further buttressing the conclusion that this claim occurred "outside the contract," is the fact that the representation that Business One could accommodate at least 120 users was not inconsistent with any provision in the Licensing Agreement. As explained by the Magistrate Judge, the Licensing Agreement is silent as to Business One's optimal number of users. Magistrate Judge White reasoned that

[h]ad the License Agreement stated that [Business One] could only handle thirty users, or that SAP did not make any

representations or guarantees as to the number of users Business One could handle, the parol evidence rule might well bar evidence of contradictory terms. (Report and Recommendation, Doc. 182, p. 817).

The Court disagrees with SAP's contention that Magistrate Judge's focus on whether terms of the Licensing Agreement are consistent with the alleged false representations creates "an exception that swallows the rule." According to SAP, the Magistrate Judge's reasoning allows for the untenable result that "any promise that is not memorialized in a later integrated written contract is necessarily collateral to the contract." The Court disagrees with this assessment, because the promise at issue in this instance is not just "any promise." Rather, it was a false representation made in breach of a common law duty independent of the Licensing Agreement. As such, the alleged misrepresentations, being collateral to the written agreement, properly form the basis of Hodell's claim of fraudulent inducement.

None of the authorities cited by SAP in its objections undermine the Magistrate Judge's conclusion. First, in *Graphic Enterprises, Inc. v. TAS International, Inc.*, 2000 WL 330059 (Ohio Ct.App. March 13, 2000), the plaintiff claimed fraud independent of a contract for the sale of copy machines. The plaintiff argued that the defendant fraudulently failed to disclose that "remanufactured" machines actually meant "used" machines. *Id.* at *5. The court rejected the claim and reasoned that

[a]ssuming, arguendo, [the defendant] fraudulently misrepresented the true character of "remanufactured" copy machines to [plaintiffs], we find the nature of [the defendant's] conduct, be it fraudulent or negligent, is irrelevant as such does not change the contractual nature

of appellant's claim. Any alleged failure by [the defendant] to supply conforming goods is purely an issue of whether [the defendant] breached the contract. *Id.*

Graphic Enterprises is distinguishable from the present case. That court's rejection of the plaintiff's fraud claims turned on the "contractual nature" of the claims, in that they amounted to nothing more than the allegation that the defendant failed to supply conforming goods. The Graphic Enterprises court further reasoned that the fraud claim failed because the plaintiffs did not offer "evidence of damages which were distinct from, and in addition to, those [the plaintiffs] claimed were suffered due to [the defendant's] alleged breach of the contract." *Id.* In the present case, the question of whether fraud damages are distinct contract damages is not presently at issue. Moreover, Hodell's fraud claims do not simply restate its breach of contract claims. Instead, as described above, Hodell sets forth sufficient evidence to show that it was induced to enter the Licensing Agreement on the basis of numerous false representations. *Graphic Enterprises* is inapposite.

*Cuthbert v. Trucklease Corp.*, 2004 WL 1879023 (Ohio Ct.App.2004), is also distinguishable. In that case, the plaintiff alleged negligence because a car rental agency failed to ensure that he had insurance coverage under a rental agreement. The court rejected the plaintiff's tort claims because they were not distinct from his breach of contract claim. The court reasoned that "any purported duties and responsibilities relating to [the defendant] procuring insurance on behalf of [the plaintiff] arose out of that contract." *Id.* at *10. In contrast, as already discussed, Hodell has provided evidence to demonstrate breach of a duty independent of the Licensing Agreement.

The Court accordingly accepts the Magistrate Judge's recommendation that summary judgment be denied as to Hodell's fraudulent inducement claims in relation to the Licensing Agreement.

In addition, because SAP does not object to the Magistrate Judge's recommendation that summary judgment be denied as to Hodell's claim that SAP fraudulently induced the Development Agreement transaction, that recommendation is accepted as well.

### 3. Negligent Misrepresentation

SAP takes issue with the Magistrate Judge's recommendation that Hodell's negligent misrepresentation claim survive summary judgment. According to SAP, the Magistrate Judge erred because he failed to recognize that the viability of a claim of negligent representation depends on the existence of a "special relationship" between the parties. As noted by SAP, some Ohio courts have limited claims of negligent misrepresentation to plaintiffs who allege injury by a certain class of professionals, "who are in the business of supplying information to others, ... such as 'attorneys, surveyors, abstractors of title and banks dealing with no-depositors' checks.'" *Middlefield Banking Co. v. Deeb*, 2012–Ohio–3191, P31. SAP argues that because it is not a member of this class of professionals, the claim fails as a matter of law.

As observed by the Magistrate Judge, there is also authority that rejects the requirement that a "special relationship" exist between the parties. *National Mulch and Seed, Inc. v. Rexius Forest By–Products, Inc.*, No. 2:02cv1288, 2007 WL 894833, at *10 (S.D.Ohio Mar. 22, 2007). *National Mulch* advises that "a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law." *Id.* The more essential consideration is whether the "defendant suppl[ied] false information for the guidance of the plaintiff in its business transactions." *Id.*

The Magistrate Judge concluded that *National Mulch's* approach was more persuasive than any authority on this subject that was cited by SAP. Because he determined that Hodell had supplied facts that could satisfy the standard as explained by *National Mulch*, he recommended that summary judgment be denied as to the negligent misrepresentation claim. SAP maintains this was error, but fails to explain why, except for repeating the same arguments and citing the same cases already rejected by both the Magistrate Judge and this Court. Because SAP fails to provide a convincing argument that the Magistrate Judge should be reversed, his recommendation is accepted.

### 4. Breach of Contract

■ SAP America argues that the Magistrate Judge erred by recommending that summary judgment be denied as to Hodell's breach of contract claim. The relevant provision of the Licensing Agreement reads as follows:

> 7.1 Warranty. SAP warrants that the Software will substantially conform to the functional specifications contained in the documentation for six months following delivery. The warranty shall not apply: (i) if the Software is not used in accordance with the Documentation; or (ii) if the defect is caused by a Modification, Integration Add–On, Licensee, third-party software, or third-party database.

(Doc. 110–12, Ex. K). SAP argues that Hodell's failure to offer any evidence that Business One failed to meet the functional specifications forecloses the need for trial.

The Court disagrees. As discussed by the Magistrate Judge, Hodell provided sufficient evidence to meet its summary judg-

ment burden. As an example, Dan Kraus, Director of the Business One channel for SAP America, sent an email in which he stated that "[i]f [Hodell] had requested the return of software due to inability to conform to documentation, we likely would have been obligated to honor the request." During his deposition, Mr. Kraus explained that by "documentation" he meant "the documentation in the software that talks about the functionality in terms of how it performs." In addition, Hodell's president, Kevin Reidl, testified at length to specific issues relating to the functionality of Business One, as they are specified in paragraph 49 of the Amended Complaint. In the Court's view, the Magistrate Judge properly concluded that issues of material fact exist as to whether SAP breached the Licensing Agreement.

Because none of SAP's objections has merit, the Court accepts the Magistrate Judge's recommendation that SAP's motion for summary judgment be denied.

### B. LSi/IBIS's Objections

 LSi/IBIS maintains that the Magistrate Judge erred by recommending that that summary judgment be denied with respect to Hodell's claims of fraud and fraudulent inducement. To prove fraud, a plaintiff must demonstrate:

(1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 169, 462 N.E.2d 407, 409 (1984). LSi/IBIS maintains that Hodell has not presented sufficient evidence to satisfy the first, third, or fifth elements of its fraud claim and that Magistrate Judge erred by concluding otherwise.

LSi/IBIS first argues that there is no evidence that it made any "independent representations" as to the quality and capacity of Business One. According to LSi/IBIS, any representation that it may have made in this regard has its source with SAP. As a consequence, LSi/IBIS argues, it cannot be held liable. This argument has no merit. As noted by the Magistrate Judge, LSi/IBIS fails to identify any authority to support the proposition that a viable fraud claim depends on the existence of false representation that was made "independently." (*See* Doc. 183, p. 8).

LSi/IBIS also argues that Hodell has not presented evidence that LSi/IBIS made a representation "with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred." It is LSi/IBIS's position that it was only passing along bad information obtained from SAP, and that when it did so it was unaware that the information was false. The Magistrate Judge recognized that evidence exists to support LSi/IBIS's contention, since Mr. Van Leeuwen testified that he was told by three SAP representatives that Business One was appropriate for a business of Hodell's size. Further, a jury may find that LSi/IBIS held the honest belief that Business One could accommodate Hodell's needs based on SAP's marketing materials which advised that the software was appropriate for businesses with five to 500 employees. On the other hand, the Magistrate Judge correctly recognized that there is also evidence by which a jury could reasonably infer otherwise. The following evidence cited by the Magistrate Judge would permit a reason-

able inference that LSi/IBIS knew or acted with disregard to the fact that the software was incompatible with Hodell's needs:

> During his deposition, Dan Kraus, Director of the Business One channel for SAP America, stated that in 2003 and 2004, SAP did not market B1 in terms of users. To his knowledge, B1 has never been marketed in terms of the number of users it could handle. (Doc. 128–1, pp. 42–43).

> During a partner meeting held on September 13–14, 2004, prior to the signing of the Development Agreement, according to the notes taken by a Jon Woodrum, at Mr. Lowery's direction, Mr. Kraus stated that the ideal B1 customer has "simple business processes" and "10 users." (Doc. 150, pp. 469–472; Doc. 158–35).

> During the deposition of Ralf Mehnert–Meland, the former director of business development for SAP America, he stated that Mr. Lowery of LSi "mis-sold" Business One to Hodell. (Doc. 152, pp. 13–14, 101–103). He stated that "we had no idea that ... a customer had been told this would be good for 250 users." *Id.* at 83.

> A document produced by LSi released by SAP to its Business One partners in March of 2005, prior to the signing of the License Agreement towards the end of December 2005, states as follows: "In future releases, SAP Business One will focus on the needs of businesses with 10 to 100 employees. While SAP Business One continues to meet the needs of many larger businesses of up to 250 employees, by concentrating on companies with 10–100 employees, we will be able to more rapidly increase penetration of the small and midsize market ..." (Doc. 158, p. 5).

> A document produced by LSi, created by Gadi Samia of SAP in 2005, states as follows: "SAP Business One is an affordable, integrated business management solution designed specifically for small and midsize companies (10–100 employees)." (Doc. 158–37, p. 4). It also indicates that the Business One "sweet spot" is for "very small business" of 1–100 employees. *Id.* at 6.

> In an email written by Mr. Mehnert–Meland, he stated that "Hodell asked the right question today: 'Did we buy the wrong solution with SAP Business One.' Based on what we know now, the answer is 'yes' as Lowery completely oversold SAP Business One.... SAP Business One was never advertised for companies with up to $250mm in revenues and 500 users." (Doc. 158–45). In another email, he stated that "Lowery needs to take responsibility for the mis-sell." (Doc. 158–43).

> Mr. Kraus also confirmed that he sent an email, marked as Exhibit 159, which stated that "[t]he partner clearly has misrepresented the [Business One] solution." (Doc. 158–44; Doc. 128–1, p. 125).

> Geoffrey Ashley is a former employee of SAP who was hired in November 2005 as the director of channel sales for North America for SAP's Business One software. (Doc. 143, p. 4.) He stated that while "SAP definitely defined or gave a range for employees. I don't recall seeing anything saying how many users, because it's almost impossible to know." *Id.* at 72

(Report and Recommendation, Doc. 183, pp. 9–10). LSi/IBIS fails to explain how Judge White erred by relying on this evidence to reach the conclusion that "a reasonable juror could further find that the information was transmitted to Hodell with either knowledge of its falsity or with such recklessness that knowledge of the

falsity may be inferred." The objection is accordingly overruled.

■ Next, LSi/IBIS maintains that Judge White incorrectly concluded that the evidence supports the element of justifiable reliance. LSi/IBIS argues that because Hodell independently investigated Business One prior to any involvement on the part of LSi/IBIS, Hodell could not have justifiably relied on any representation that LSi/IBIS might have later made with regard to Business One. As the Court understands it, LSi/IBIS seems to be arguing that by forming a prior independent basis for believing that Business One would accommodate its needs, Hodell either could not possibly rely on LSi/IBIS's representations or Hodell was not justified in doing so. Neither argument has merit. First, LSi/IBIS fails to offer any reasoned explanation as to how Hodell's own investigation forecloses reliance on LSi/IBIS's representations. There is no apparent reason why, despite its independent belief, Hodell could not also have relied on the representations of a company that took a meeting with SAP to "evaluate whether [Business One] might be a fit for Hodell...." And, because Hodell did independently investigate Business One, it would be all the more justified in relying on LSi/IBIS's representations since they were consistent with its own findings. Moreover, the record evidence described in Hodell's response to LSi/IBIS's objections supports a finding of justifiable reliance. LSi/IBIS's objection is accordingly overruled.

■ Next, LSi/IBIS objects to the recommendation that summary judgment be denied in relation the Hodell's breach of contract claim. LSi/IBIS argues that it fulfilled all its obligations under the Development Agreement to develop In–Flight Enterprise for Business One. The Magistrate Judge concluded that the Development Agreement could reasonably be construed to obligate LSi/IBIS to *successfully* implement In–Flight for Business One. Because the contract was not clear and unambiguous as to what constituted "successful implementation," Judge White concluded that the definition of "successful implementation" may depend on extrinsic evidence, which should be considered by the trier of fact. Further, because record evidence suggests that In–Flight was not successfully implemented, the Magistrate Judge recommended denying the LSi/IBIS's motion in relation to the breach of contract claim.

LSi/IBIS argues that Judge White erred because when he reviewed the Development Agreement, he failed to consider the following language:

Project Description: The development of the IBIS Group's In–Flight Enterprise application and its integration into SAP Business One Software for Hodell–Natco Industries, Inc.

According to LSi/IBIS this language means that "the project is for the development and integration of In-flight for Business One." Thus, LSi/IBIS argues, because it fulfilled this obligation, Hodell cannot demonstrate that LSi/IBIS breached the Development Agreement.

LSi/IBIS offers no clear explanation as to how the language contained in the "Project Description" undercuts the Magistrate Judge's conclusion that a reasonable interpretation of the contract is that LSi/IBIS was obligated to *successfully* implement In–Flight Enterprises. As noted by the Magistrate Judge, "the Development Agreement ... affirmatively and unequivocally states that [payment] 'will be due on successful implementation.'" It is not readily apparent how Judge White could be said to have erred in light of the language contained in the Project Description. Nor does LSi/IBIS challenge the

conclusion that evidence exists to show that In-flight was not successfully implemented. Because LSi/IBIS has essentially failed to object to Judge White's recommendations on this point, those recommendations are accepted by this Court.

■ LSi/IBIS also argues that Hodell's implied warranty theories fail. First, LSi/IBIS argues that Hodell cannot establish a breach of the implied warranty of merchantability because Business One is a good that is "one-of-a-kind, new, or for which there is not yet a market to which to compare the good." (Doc. 188, p. 18).

Goods are not merchantable when they are "not of an acceptable quality when compared to that generally acceptable in the trade for goods of the kind." *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 424 (6th Cir.1981). LSi/IBIS contends that because the combination of In–Flight Enterprise with Business One had not previously existed in the industry, there are no other "goods of the kind" by which its quality may be judged. As such, it maintains that no implied warranty of merchantability exists in this instance.

LSi/IBIS relies on *Price Brothers* to support its argument. In that case, the parties

> contracted for the sale of components to be installed in a highly complex piece of machinery. The components had never before been used in machinery of that type. The specific machinery was itself new and had never been operated with or without the components.

*Id.* at 424. The owners of the machinery sued the seller of the components, arguing a breach of implied warranties. The court held that

> In these circumstances no average or usual standards for determining ordinary performance or quality for the components can be determined, and no

warranty of merchantability arises from the transaction.

*Id.*

This Court is not persuaded that *Price Brothers* forecloses Hodell's claim that LSi/IBIS breached the implied warranty of merchantability. There is no dispute that In–Flight had never been paired with Business One and that, in this way, the good was unique. However, this is not to say that no other goods of the kind exist in the trade. Unlike the situation in *Price Brothers*, In–Flight was an existing product that had been previously paired with FACTS, the software product used by Hodell before it switched to Business One. Further, Business One was itself an existing product. Based on these distinguishing facts, LSi/IBIS does not make a convincing case that there is "no average or usual standard[ ] for determining ordinary performance or quality." *Id.* at 424. LSi/IBIS does not explain why the applicable standard of merchantability could not be determined with reference to how Business One and In–Flight (or similar software) had performed in the past.

■ LSi/IBIS also argues that it is entitled to summary judgment on Hodell's claim that it breached the implied warranty of fitness for a particular purpose. In order to recover under an implied warranty of fitness for a particular purpose under Ohio Rev.Code § 1302.28, Plaintiff must prove the following two elements:

> First, the seller must be aware at the time of contracting of a particular purpose for which the buyer intends to use the goods. Second, the buyer must rely on the seller's skill or judgment to select or furnish goods suitable for that particular purpose.

*Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir.1981) (citing Ohio Rev.Code Ann. § 1302.28). LSi/IBIS maintains that Hodell's claim

fails because it cannot establish that it relied on LSi/IBIS's skill or judgment to select either In–Flight or Business One.

In response, Hodell presents the testimony of Mr. Van Leeuwen, which states that he "had a very good understanding of Hodell–Natco's business processes, just because of the length of engagement and the relationship [he] had with them." (Doc. 138, p. 52). Further, Mr. Van Leeuwen acknowledged that Hodell was relying on LSi's judgment and skills in selecting Business One and In–Flight. In the Court's view, Hodell has presented evidence by which a jury could conclude that Hodell relied on LSi/IBIS skill or judgment to select the software products.

 Finally, LSi/IBIS argues that the Magistrate Judge erroneously recommended that summary judgment be denied as to Hodell's claim of negligent misrepresentation. LSi/IBIS maintains that under Ohio law Hodell cannot recover under theories of both fraud and negligence based on the same course of conduct. *See Textron Financial Corp. v. Nationwide Mutual Ins. Co.*, 115 Ohio App.3d 137, 149, 684 N.E.2d 1261 (Ohio Ct.App.1996). While this is certainly true, since a defendant cannot act both intentionally and negligently in relation to the same conduct, it is not a problem at this stage of the proceedings. As noted by Hodell, while a plaintiff cannot ultimately recover on both theories, it may try both claims, alternatively, before a judge or jury.

## VI. Conclusion

For the reasons stated above, the Magistrate Judge's R & Rs are adopted by this Court. SAP's motion for summary judgment is denied. (Resolving Doc. 110). LSi/IBIS's motion for summary judgment is granted in part and denied in part. (Resolving Doc. 105). Specifically, the motion is granted as to Hodell's negligence claim and denied in other respects. Hodell's motion for judgment on the pleadings/motion for summary judgment is denied. (Resolving Doc. 109).

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

GREG WHITE, United States Magistrate Judge.

On November 16, 2012, this matter was referred to the Court to address three pending motions for summary judgment. (ECF No. 170.) This Report and Recommendation addresses the motion for summary judgment filed on September 7, 2012 by Defendant SAP America and SAP AG (collectively "SAP"). (ECF No. 110.) Plaintiff Hodell–Natco Industries, Inc. (hereinafter "Hodell") filed a brief in opposition (ECF Nos. 155, 162), to which SAP replied. (ECF No. 163.) On February 28, 2013, the Court heard oral arguments.[1] (ECF No. 178.)

## I. Procedural and Factual Background

Plaintiff Hodell, an Ohio corporation with its principal place of business in Valley View, Ohio, filed an Amended Complaint on April 22, 2009 setting out five causes of action against LSi–Lowery Sys-

---

1. Previously, on February 1, 2013, the Court held a settlement conference. (ECF No. 175.) At the time, Defendant SAP requested the opportunity to present oral arguments before the Court. Subsequently, on or about March 18, 2013, the parties contacted the Court indicating that additional information not produced during discovery had come to light, which delayed consideration of the pending motions. At that time, it was indicated additional briefing might be requested. After the additional information was produced, the parties notified the Court that they would not seek to supplement their briefs.

tems, Inc. (hereinafter "LSi"), The IBIS Group, Inc. (hereinafter "IBIS"), SAP America, Inc., and SAP AG. (ECF No. 26.) Hodell's claims involve two contracts and the negotiations and representations made prior to their consummation. (*See generally* Amended Compl.) Specifically, Hodell alleged the following causes of action against all Defendants: (1) fraudulent inducement; (2) fraud; (3) breach of contract; (4) negligence; and (5) negligent misrepresentation. (ECF No. 26.)

On May 18, 2009, Defendants LSi and IBIS filed a joint Answer.[2] (ECF No. 30.)

On June 21, 2009, the SAP defendants filed a motion to dismiss. (ECF No. 36.) On September 2, 2010, 2010 WL 6765522, after hearing oral arguments, this Court issued a Report and Recommendation providing that SAP's motion to dismiss should be granted in part and denied in part. (ECF No. 50.) Specifically, it was recommended that Hodell's claim for breach of contract, as it related to the Development Agreement entered into on or about December 20, 2004, as well as the simple negligence action, be dismissed as to both SAP defendants. *Id.* In addition, it was recommended that Hodell's claim for breach of the License Agreement should be dismissed as to Defendant SAP AG only, and that the motion to dismiss be denied with respect to counts one, two and five (fraud, fraud in the inducement, and negligent misrepresentation). *Id.*

On June 2, 2011, 2011 WL 2174365, Judge Lesley Wells adopted the Report and Recommendation in its entirety. (ECF No. 61.)

On June 24, 2011, SAP filed an Answer. (ECF No. 69.)

Though many of the facts in this matter are contested, the following are either uncontested or are now law of the case.

On or about December 20, 2004, Hodell and LSi executed a Development Agreement, attached to the Amended Complaint as Exhibit D (hereinafter the "Development Agreement"). (ECF No. 26 at ¶¶ 30–32; ECF No. 30 at ¶ 15.) The Court has found that the SAP defendants were not parties to the Development Agreement. (ECF Nos. 50, 61.) The Development Agreement called for Hodell to order 80 user licenses for SAP's Business One ("B1") software at a cost of $300,000.00. (ECF No. 26 at ¶¶ 30–32; ECF No. 30 at ¶ 15.) SAP denies that it received a $300,000 license fee from Hodell for 80 user licenses of B1 software. (ECF No. 69 at ¶ 31.) On December 20, 2004, LSi issued an invoice to Hodell–Natco for 80 user software licenses for SAP B1, a copy of which is attached to the Amended Complaint as Exhibit F.[3] (ECF No. 26 at ¶¶ 30–32; ECF No. 30 at ¶ 15.)

On or about December 23, 2005, Hodell alleges it purchased 40 user licenses from IBIS and, in connection with this purchase, signed a License Agreement attached to the Amended Complaint as Exhibit G. (ECF No. 26 at ¶ 46.) In its Answer, SAP admitted only that Hodell executed a maintenance schedule to the License Agreement in December 2005. (ECF No. 69 at ¶ 46.) However, SAP's motion for summary judgment argument is based almost entirely on the existence of the License Agreement as a binding contract

2. According to the Answer, IBIS, an Illinois corporation, became a wholly owned subsidiary of LSi, a Missouri corporation, in April of 2004. (ECF No. 30 at ¶¶ 4–5.)

3. SAP denies this statement based on lack of knowledge and information sufficient to form a belief as to the truth of the averment that LSi issued an invoice or that the referenced exhibit is authentic. (ECF No. 69 at ¶ 32.)

between Hodell and SAP. (ECF No. 110–1 at iii, iv, 1, 14–19.)

While the total number of licenses purchased should be straightforward, SAP maintains that it sold only 80 licenses to Hodell. (ECF No. 110–1 at 9, 12; Oral Arguments Tr. 29.) However, because the Court must make all reasonable inferences in favor of the non-moving party, the Court will presume that Hodell purchased a total of 120 B1 user licenses from SAP. The following, though not inclusive of all the evidence on the issue, is sufficient to give rise to the inference in Hodell's favor. The aforementioned invoice from IBIS to Hodell, dated December 24, 2004, referencing the purchase of 80 SAP B1 user licenses for $300,000. (ECF No. 26 at ¶¶ 31–32, Exh. F; ECF No. 30 at ¶ 15.) Hodell alleges that it purchased 40 more licenses on or about December 25, 2005, when it signed the License Agreement.[4] (ECF No. 26 at ¶ 46.) The License Agreement attached to the Amended Complaint is silent as to the number of users being purchased. (ECF No. 26, Exh. G.) However, evidence has been presented that Hodell had installed and was operating 120 B1 licenses in total, which reasonably supports the inference that SAP actually sold that number of licenses to Hodell. This includes:

- In a January 24, 2006 email, Avery Myrick, Vice President of Tech Services for LSi, wrote an email to Manfred Weis of SAP. (ECF No. 155–38, Exh. 141.) Mr. Myrick indicated that "We need some help in sizing Hardware for a large SAP install to make sure we get it right. They will have **_120 users._** 80 professional and 40 CRM." [5] _Id._ (emphasis added).

- In an email sent from Dan Lowery, President of LSi, to Udi Ziv, general manager for Small Business Solutions for SAP at that time, Mr. Lowery stated that "We have **_installed_** a **_120 user B1 deal_** at Hodell Natco in Cleveland with an add-on we developed called In–Flight Enterprise." (ECF No. 155–11, Exh. 69) (emphasis added). Mr. Lowery confirmed he sent such a message during his deposition. (ECF No. 149, Lowery Dep. at 296.)

- In his deposition, Kevin Reidl of Hodell stated that Hodell had purchased 120 B1 user licenses from SAP: "I know we had purchased 120. I know we had purchased 80, and then 40 separately." (ECF Nos. 142, K. Reidl Dep. at 274–76.)

- Geoffrey Ashley, is a former employee of SAP who was hired in November 2005 as the director of channel sales for SAP's B1 software in North America. (ECF No. 143, Ashley Dep. at 4.) In an email he sent on April 17, 2007, Mr. Ashley wrote that "Hodell **_currently has 120 users._** They expect to grow at 17% compounded growth per year. They expect to be at 300 users in the short-term (next couple of years)." (ECF No. 155–42, Exh. 159) (emphasis added).

Nevertheless, for the purpose of the motion under consideration, the Court need not resolve whether Hodell purchased 120

---

4. The dates these licenses were delivered are in dispute. For the purposes of this report and recommendation, the delivery dates are not important.

5. During his deposition, Mr. Lowery of LSi identified the email as one it produced during discovery. (ECF No. 151, Lowery Dep. at 613–14.) From the email chain, it is apparent that the referenced customer is Hodell. (ECF No. 155–38, Exh. 141.)

licenses or only 80, as that is a factual issue reserved for the trier of fact.[6]

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and states:

A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In considering summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (*citing Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.* "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). When ruling on a motion for summary judgment, "a judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 (citations omitted); *accord Fuller v. Landmark 4 LLC*, 2012 WL 1941792 (N.D.Ohio May 29, 2012). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter...." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "It is an error for the district court to resolve credibility issues against the nonmovant." *Cen-*

---

**6.** It is also debatable whether the difference between 80 users and 120 users is significant, as there is some evidence, discussed below, that B1 could not accommodate the lower number.

*Tra, Inc. v. Estrin,* 538 F.3d 402, 412 (6th Cir.2008) ("In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case.") (citations omitted).

## III. Law and Analysis

### A. Fraud/Fraud–in–the–Inducement

Hodell maintains that SAP is liable for fraud and fraud-in-the-inducement regarding both the License Agreement *and* the Development Agreement. (ECF No. 162 at 27.) SAP asserts that it is entitled to summary judgment with respect to Hodell's fraud and fraud-in-the-inducement claims because there is insufficient evidence to satisfy all the necessary elements.

 According to Ohio law, in order to maintain a cause of action for fraud, a plaintiff must demonstrate the following: (a) a representation or, where there is a duty to disclose, concealment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.,* 462 N.E.2d 407, 10 Ohio St.3d 167, 169 (Ohio 1984) (citations omitted); *accord Magical Farms, Inc. v. Land O'Lakes, Inc.,* 356 Fed.Appx. 795 (6th Cir.2009); *David A. Flynn, Inc. v. GMAC,* 2008 WL 2185377, 2008 U.S. Dist. LEXIS 41597 (N.D.Ohio May 23, 2008). "The elements of the claim are conjunctive, and accordingly all of them must be shown." *Graham v. Am. Cyanamid Co.,* 350 F.3d 496, 507 (6th Cir.2003). Likewise, under Ohio law, "a claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation.... A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the [agreement] or other wrongful conduct induced a party to enter into the [agreement]." *Am. Coal Sales Co. v. N.S. Power Inc.,* 2009 WL 467576, 2009 U.S. Dist. LEXIS 13550 (S.D.Ohio, Feb. 23, 2009) (citing *ABM Farms, Inc. v. Woods,* 81 Ohio St.3d 498, 502–3, 1998–Ohio–612, 692 N.E.2d 574 (Ohio 1998)). To prove fraudulent inducement, a plaintiff must demonstrate the same elements necessary to prove an action for fraud. *See, e.g., Micrel, Inc. v. TRW, Inc.,* 486 F.3d 866, 874 (6th Cir.2007); *Scotts Co. LLC v. Liberty Mut. Ins. Co.,* 606 F.Supp.2d 722, 741 (S.D.Ohio 2009).

First, it is asserted that Hodell cannot show that SAP made a false representation regarding B1's capabilities that was material to the execution of the December 2005 License Agreement. Specifically, SAP argues that Hodell cannot show SAP's B1 software was incapable of handling up to 300 users. (ECF No. 110–1 at 20–24.) Hodell was sold 120 user licenses. The material issue is whether Hodell was told that the B1 software could accommodate at least that many users. Hodell has pointed to the following representations it received from SAP, directly or through its alleged partners, concerning the capabilities of B1 software: [7]

---

7. The parties disagree whether LSi and IBIS were partners and/or agents of SAP. In their joint Answer, LSi and IBIS admitted that they were "SAP Partners authorized to market and service the SAP Business One product and were agents of SAP for purposes of the SAP

- On December 31, 2003, Hodell's president, Otto Reidl, met with representatives from American Express and LSi, he believed to be authorized agents and representatives of SAP. (ECF No. 155–82, Exh. F, O. Reidl Dep. at 138–39.) At that meeting Reidl was told that B1 can handle 300 or 500 users.[8] *Id.* at 112, 139.

- A report on what appears to be SAP letterhead states that "[w]hether you have 5 employees or 500, SAP [B1] helps emerging businesses streamline their operational and managerial processes." (ECF No. 155–5, Dep. Exh. 38.)

- An SAP Business One Brief states that B1 "helps emerging businesses, from those with 10 to several hundred employees, to streamline their operational and managerial processes." (ECF No. 155–59, Dep. Exh. 314.)

- In Requests for Admissions, Dan Lowery, President of LSi, admitted that he "was authorized to, and did in fact, make representations regarding the [B1] Software's qualities, characteristics and suitability for [Hodell's] business." (ECF No. 158–3, Admiss. 12.) During his deposition, Mr. Lowery stated that SAP both authorized and encouraged LSi to refer to itself as an SAP business partner, and permitted LSi to use SAP's logo on its letterhead. (ECF

products ... [and that they] were SAP partners and agents of SAP for the SAP products." (ECF No. 30 at ¶¶ 11–12.) SAP points to its agreements with LSi and IBIS that specifically disclaim agency or partnership relationships. (ECF No. 110–1; 163.) However, there is no indication that Hodell was aware of these agreements or the terms contained therein. As such, even if LSi and IBIS were not authorized agents, factual issues remain whether SAP could be found liable through a theory of apparent agency or agency by estoppel. As stated in 3 Ohio Jur.3d Agency and Independent Contractors § 79: "A principal's liability for an agent's acts and contracts is not limited to those which are expressly authorized, necessarily implied from express authority granted, or otherwise actually conferred by the principal. The agent's acts within the apparent scope of the authority conferred upon the agent, even though no actual authority to do such acts or to make such contracts has in fact been conferred, are also binding on the principal. As to third persons, the power of an agent is not only that conferred upon the agent by his or her commission, but that which the agent is held out as possessing. When an agent acts within the scope of the agent's apparent authority, unless the third person has notice that the agent is exceeding the agent's actual authority, the principal is liable. The term 'apparent authority' is used to describe or label what is treated as the equivalent of actual authority." (Citations omitted); *see also Sinclair Ref. Co. v. Lecrone Motor Transp. Line,* 34 N.E.2d 822, 824 (Ohio Ct.App.1940) (noting that agency by estoppel is well recognized in Ohio law); *In re Atl. Fin. Mgmt., Inc.,* 784 F.2d 29, 31–32 (1st Cir.1986) ("[A] corporation's liability for an agent's misrepresentations may rest upon a theory of 'apparent authority.' The agent's tortious action, while not actually authorized by the corporation, appears so to those adversely affected. Vicarious '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business provided to him.") (*quoting* Restatement (Second) of Agency § 8). Hodell has cited sufficient evidence in its brief (ECF No. 162 at 9–10) to at least create a genuine issue of material fact as to whether SAP clothed LSi or IBIS with apparent authority. Furthermore, there is evidence, if credited, that the representations were actually made by SAP and simply relayed by LSi/IBIS.

8. At one point during his deposition, Otto Reidl stated he was told at a December 3, 2003 meeting that B1 could handle 500 users. (ECF No. 155–82, Exh. F, O. Reidl Dep. at 112–13.) Later during his deposition, he indicated American Express told him B1 could handle 300 users. *Id.* at 139.

Nos. 148–151, Lowery Dep. at 56–68.) Lowery stated that B1 was marketed for 250 users, and in some instances as many as 500 users. *Id.* at 362.

- Dale Van Leeuwen, sole owner of IBIS, stated during his deposition that "[i]n 2004 it was clearly advertised, presented to partners, including myself, that the SAP [B1] Suite was for those customers with three to 500 users, and for not just the small market but also mid-sized market." (ECF No. 138, Van Leeuwen Dep. at 14–15, 166.)

- Mr. Van Leeuwen of IBIS stated that he flew to Atlanta to meet with SAP representatives, including Ralf Mehnert–Meland, Chris Robinson, and Daniel Kraus. (ECF No. 111–1, Van Leeuwen Dep. at 29.) He stated that he was told that B1 was appropriate for three to 500 users. *Id.* at 54–55, 197–98.

- In an email to SAP, Mr. Lowery wrote that "[a]t the time, SAP B1 was targeted to companies of $250 million, with 500 users." (ECF No. 158–19, Exh. 81.)

- In his deposition, Kevin Reidl of Hodell stated that he was told by Mr. Lowery in 2004 that B1 could support up to 300 or 500 users. (ECF Nos. 141–142, K. Reidl Dep. at 101–103.)

- In an email to Mr. Lowery, Mr. Ashley, formerly of SAP, wrote that "I have always told SAP, Dan, lawyers,

etc. that this was a case where we had a product not ready for prime time, *a partner relying on documentation that SAP put together,* a prospect/customer relying on SAP to back their commitments...." (ECF No. 155–48, Exh. 174) (emphasis added).[9]

The above cited evidence is not intended to be all inclusive. However, the evidence is sufficient to support a finding by reasonable jurors that SAP, directly and/or through third parties that it held out as agents and/or partners, represented to Hodell that its B1 Software could handle at least 250 users and, by implication, the 120 user licenses that Hodell purchased.

The following evidence of record[10] could allow reasonable jurors to find that the above representations were made with knowledge of their falsity or with such utter disregard and recklessness as to whether the statements were true or false that knowledge could be inferred:

- During his deposition, Ralf Mehnert–Meland, the former director of business development for SAP America, stated that "[n]o way [SAP B1 software] would have ever worked for this—for 500 users" and that he agreed B1 was "mis-sold" to Hodell. (ECF No. 152, Mehnert–Meland Dep. at 13–14, 101–103.)

- In an email, Dan Kraus, Director of the Business One channel for SAP America, wrote that "[w]e very simply need to figure out if there is a solution in A1 for this customer or if

**9.** In its motion for summary judgment, LSi/IBIS cites an undated document that purports to identify "SAP's Market Strategy" for its B1 software. (ECF No. 105–13, Exh. 14.) The documents states that "As to customers, the general target market for Business One is any small and medium size business with between 5 and 500 *users.*" *Id.* (emphasis added.)

**10.** This material is not intended to be exhaustive of the exhibits and depositions cited by the parties, but rather illustrates that evidence exists in the record that could allow a reasonable juror to find in favor of the non-moving party on those issues where it bears the burden of proof.

we [just] refund our license fees. There is no go-forward path here with Business One. The partner clearly has misrepresented the solution." (ECF No. 158–44, Exh. 159; ECF No. 128, Kraus Dep. at 13.)

- In an email, Mr. Mehnert–Meland, stated that "Hodell asked the right question today: 'Did we buy the wrong solution with SAP Business One.' Based on what we know now, the answer is 'yes' as Lowery completely oversold SAP Business One. . . . SAP Business One was never advertised for companies with up to $250mm in revenues and 500 users." (ECF No. 158–45, Exh. 160.)

- An SAP pamphlet from a summer sales meeting dated July 17, 2006, warned that the following were "red flags" that an opportunity was too large for SAP's B1 software: revenue and growth both larger than $50 million and 10% and the **number of users exceeds 30.** (ECF No. 155–31 at 24) (emphasis added).

- On April 12, 2007, Udi Ziv, then general manager for Small Business Solutions for SAP, wrote an email with a subject line of "RE: Dan Lowery–Hodell Natco." (ECF No. 155–11; ECF No. 154, Ziv Dep. at 12–13.) The email reads as follows: "Someone has sold to the wrong customer, which is WAY above any sane B1 sweet spot (120 users ! ! !)" (emphasis in original). *Id.*

The intent to mislead may also be inferred from the above evidence. As noted by several Ohio courts, "[r]arely is the subjective intent of the party alleged to have committed fraud provable by direct evidence. Fraud must be measured by objective standards. . . . The existence of intent to mislead or defraud must be considered under the totality of the circumstances." *Klapchar v. Dunbarton Properties, Ltd.*, CA–8521, 1991 WL 249432 (Ohio Ct.App. Nov. 4, 1991); *accord Arales v. Furs By Weiss, Inc.*, 2003–Ohio–3344, 2003 WL 21469131 (Ohio Ct.App. June 26, 2003); *Davis v. Sun Ref. & Mktg. Co.*, 109 Ohio App.3d 42, 56, 671 N.E.2d 1049, 1059 (1996) (observing that "as intent is rarely provable by direct evidence, it may be inferred from the 'totality of the circumstances.'") Reasonable jurors could find that SAP intentionally misled Hodell so that it would purchase the B1 software. This inference is further buttressed by the statement of SAP's former director of channel sales for the B1 software, Mr. Ashley, who was updated weekly about the Hodell sale. (ECF No. 114–1, Ashley Dep. at 103–04.) In an email, Mr. Ashley stated that Hodell was "a very high profile account we are working to bring live" and was SAP's "first customer for a new add-on product specifically created by [LSi] for the Fastener Distribution Industry." (ECF No. 155–50, Exh. 178.) In a letter dated January 2, 2006, Mr. Ashley stated that "LSi, was able to close Hodell–Natko Industries for $105,000 to SAP. This was an important win not only for its size, but also for the fact that it is the first of what we hope will be many new customers in the Fastener micro-vertical. LSi has created a Business One vertical solution specific to this industry and we are looking to Hodell–Natko to be our first happy, referenceable customer within this space." (ECF No. 155–49, Exh. 177.) Based on the above and the totality of the circumstances, it can be inferred that SAP oversold its B1 product as Hodell was seen as a critical gateway customer to gain a foothold in a whole new industry.

 While it may be that the sales team for SAP did not actually know the alleged representations were inaccurate or

actively seek to sell Hodell a product that was not suitable for its needs, "Ohio has long recognized '[a] corporation cannot see or know anything except by the eyes and intelligence of its officers.' A corporation can act only through its officer and agents, and the knowledge of the officers of a corporation is at once the knowledge of the corporation." *Orrenmaa v. CTI Audio, Inc.*, 2008–Ohio–4299, 2008 WL 3892190 (Ohio Ct.App. Aug. 22, 2008) (*citing Orme v. Baker*, 74 Ohio St. 337, 78 N.E. 439 (Ohio 1906); *Arcanum Nat'l Bank v. Hessler*, 69 Ohio St.2d 549, 557, 433 N.E.2d 204 (Ohio 1982); *The First Nat'l Bank of New Bremen v. Burns*, 88 Ohio St. 434, 103 N.E. 93 (Ohio 1913)). As such, intent can be imputed to the entire corporation even though none of the individuals allegedly making misrepresentations had knowledge of their falsity. Furthermore, if there was a disconnect or miscommunication between the sales and technical personnel, recklessness and/or negligence could also be reasonably inferred.

Despite the presence of a genuine issue of material fact as to whether SAP falsely represented the capabilities of its B1 software to Hodell, SAP argues that any representation made as to the number of users B1 could accommodate was not material to the transaction at hand. (ECF No. 110–1 at 24–26.) Specifically, SAP asserts that Hodell possessed information that contradicted the above representations that B1 was suitable for Hodell's needs. *Id.* SAP points to a news release from October 2004 which states that B1 was developed for companies with less than 250 employees, a news release cited in the Amended Complaint. *Id.* at 25. While SAP considers this evidence to be critical, the Court disagrees. Even if SAP only stated that B1 could handle as few as 250 users, this representation necessarily implies that the B1 software could accommodate the 120 licenses sold to Hodell.[11] However, according to SAP's manager for Small Business Solutions, 120 users was "WAY above any sane B1 sweet spot."[12] (ECF No. 155–11; ECF No. 154, Ziv Dep. at 12–13.) As such, the Court finds that the representations of SAP and/or its agents could reasonably be found to be material by the trier of fact.

SAP also asserts that representations as to the higher number of users were not material because a document dated November 1, 2005, indicated that B1 was aimed at companies who are looking for 10 to 100 users. (ECF No. 110–1 at 26.) However, there is no evidence that Hodell had seen this document prior to entering the License Agreement in December of 2005. The only evidence on this issue cited by the parties is Otto Reidl's testimony that this document was not obtained until an internet search was performed

11. There is some debate as to whether the number of employees equates to a representation as to the number of users. The Court believes this issue is best left for the finder of fact, as this Court cannot say that, as a matter of law, the representation as to the number of employees the software could accommodate cannot reasonably be construed as a corresponding representation as to the number of users that can be accommodated. Theoretically, a company with 500 employees may only have 5 employees who regularly utilize the computer system. On the other hand, there may be several hundred.

12. SAP suggests that because Hodell anticipated expanding up to 300 users in the future while arguably ˙knowing that B1 was only suitable for companies with up to 250 users, the representations were not material. (ECF No. 110–1 at 25–26.) However, the operative number herein is 120—the actual number of users purchased. Nonetheless, during his deposition, Kevin Reidl of Hodell indicated that, even if he was aware that B1 could only accommodate up to 250 users, he would not have ruled it out. (ECF Nos. 141 & 142, K. Reidl Dep. at 103–04.) As such, this Court cannot find the representations immaterial.

after filing the instant Complaint. (ECF No. 129–2, O. Reidl Dep. at 205–06.) SAP asserts that because the information was publicly available prior to the execution of the License Agreement, previous representations were immaterial. *Id.* The Court disagrees that public availability of contrary evidence affects the materiality of the previous representations. It may, however, go to the issue of whether Hodell's reliance was reasonable.

■ SAP cites the following Ohio law on determining the reasonableness of reliance:

> Factors to be considered in determining whether reliance is reasonable include 'the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age and mental and physical condition of the parties, and their respective knowledge and means of knowledge.' An individual 'has no right to rely on misrepresentations when the true facts are equally open to both parties.'

*Lucas Ford, LLC v. Ford Motor Credit Co.*, 2011 WL 1831739, 2011 U.S. Dist. LEXIS 51141 (N.D.Ohio May 12, 2011) (quoting *Freedom Foods, Inc. v. Rose Valley Land Group, Ltd.*, 2006 WL 2045887, 2006 U.S. Dist. LEXIS 49591 (S.D.Ohio)). Under the circumstances, it can hardly be said that Hodell and SAP were equals in ascertaining the capabilities of the B1 software. The Court finds the issue of whether Hodell reasonably relied on the statements catalogued above is best left to the trier of fact.[13] *See, e.g., Angrisani v. Capital Access Network, Inc.*, 175 Fed.Appx. 554, 557 (3d Cir.2006) (finding the question of whether the plaintiff's reliance on a representation was reasonable presented "a factual issue that is more properly left to the judgment of the jury"); *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 16 (1st Cir.2004) ("[T]he reasonableness of a party's reliance ordinarily constitutes a question of fact for the jury."); *Miller v. Premier Corp.*, 608 F.2d 973, 982 (4th Cir. 1979) ("[I]ssues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the trier of fact.")

■ Finally, SAP argues that Hodell cannot demonstrate an injury proximately caused by the reliance as a matter of law. (ECF No. 110–1 at 31–34.) SAP avers that the harm suffered by Hodell was the result of its own decision to "go-live" after testing in March of 2007. *Id.* SAP's argument on this issue is devoid of any citation to law, and is conclusory at best. Further, it assumes that no damages were incurred by Hodell prior to the "go-live" date. In this Court's view, this argument goes to the extent of the damages suffered, an issue best left for the trier of fact.

---

13. SAP's argument that the representations as to the number of users B1 could support constituted mere "puffery" on which no reasonable person could rely is wholly without merit. (ECF No. 110–1 at 29–30.) "Puffery is generally defined as exaggerated blustering or subjective boasting upon which no reasonable consumer would rely." *Davis v. Byers Volvo*, 2012–Ohio–882, 2012 WL 691757 (Ohio Ct.App. Feb. 24, 2012) (internal quotation marks and citations omitted) (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3rd Cir.1993) (defining puffery as "an exaggeration or overstatement expressed in broad, vague and commendatory language")); *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1114 (D.N.J.1987) (defining puffery as advertising the advantages of a product including claims of general superiority). Here, Hodell is not complaining that SAP made vague statements that their B1 Software was "quality," or simply better than the competition. The representations at issue concern *specific* statements as to the number of users the B1 software could accommodate.

For the foregoing reasons, it is recommended that SAP's motion for summary judgment with respect to the fraud and fraud-in-the-inducement claims be denied.

### B. Negligent Misrepresentation

■ SAP asserts that it is entitled to summary judgment on Hodell's negligent misrepresentation claim because it is not in the business of supplying information. (ECF No. 110–1 at 34–35.)

■ Under a claim for negligent misrepresentation in Ohio, a defendant who, "in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions ... is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *David A. Flynn, Inc. v. GMAC*, 345 Fed. Appx. 974, 977 (6th Cir.2009) (*citing Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 505–06 (6th Cir.2003)); *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 41 Ohio St.3d 1, 4 (Ohio 1989).

SAP argues that a recent decision of an Ohio appellate court, *Middlefield Banking Co. v. Deeb*, 2012–Ohio–3191, 2012 WL 2874893 (Ohio Ct.App. July 16, 2012), clarified that negligent misrepresentation claims are limited to professionals, such as accountants and attorneys, in the business of supplying information. (ECF No. 110–1 at 34–35.) However, in her order adopting the previous Report and Recommendation, Judge Wells found as follows:

> The question remains, however, whether Hodell's negligent misrepresentation claim is otherwise adequately pled. The SAP defendants' only argument on this point is that Hodell did not plead facts to support the existence of the requisite "special relationship" between Hodell and the SAP defendants. (Doc. 52, at 7–8). The SAP defendants cite a number of federal court decisions interpreting Ohio law, which have concluded that "[a] core requirement in a claim for negligent misrepresentation is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction." *Hayes v. Computer Associates Intern., Inc.*, 2003 WL 21478930, at *6 (N.D.Ohio 2003) (*citing Picker Intern., Inc. v. Mayo Found.*, 6 F.Supp.2d 685, 689 (N.D.Ohio 1998)). "This relationship occurs only in 'special' circumstances. Usually the defendant is a professional (*e.g.*, an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class." *Picker Intern.*, 6 F.Supp.2d at 689.
>
> The "special relationship" requirement imposed by these courts does not appear to be a formal element of the tort of negligent misrepresentation, as that tort is defined in Ohio. The Ohio Supreme Court has spoken on the sort of relationship required, explaining that liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." *Gutter v. Dow Jones, Inc.*, [22 Ohio St.3d 286] 490 N.E.2d 898, 900 (Ohio 1986); *accord Haddon View Inv. Co. v. Coopers & Lybrand*, [70 Ohio St.2d 154] 436 N.E.2d 212 (Ohio 1982).
>
> On this point, Hodell has pleaded sufficient facts to survive a motion to dismiss.

(ECF No. 61 at 13–14.)

First, the *Middlefield Banking* decision—a state appellate court opinion—does

not represent an intervening change in controlling Ohio law. The general proposition therein, that a special relationship is necessary, outside of a business transaction, to maintain a negligent misrepresentation claim, is not new. While the Court recognizes there are decisions that support such a view, that line of argument was squarely addressed and expressly rejected by the Court in the ruling on the Motion to Dismiss. Because SAP's argument is: (1) identical the one it made earlier; and, (2) dependent upon its interpretation of the law and not on any new factual developments that came to light during discovery, the Court sees no reason to revisit the issue at the summary judgment stage.

Second, there are decisions that reject the "special relationship" requirement. *See, e.g., Versatile Helicopters v. City of Columbus,* 879 F.Supp.2d 775, 783 (S.D.Ohio 2012) (noting that "some persuasive authority rejects the argument that there must be a 'special relationship' between" a plaintiff making a negligent misrepresentation claim and the defendant who made the representation); *Culy Constr. & Excavating, Inc. v. Laney Directional Drilling Co.,* 2012 WL 2071804, 2012 U.S. Dist. LEXIS 79575 (S.D.Ohio June 8, 2012) ("some persuasive authority rejects Culy's too-narrow 'special relationship' argument."); *Bank of Am. v. Kenwood Towne Place,* 2010 Ohio Misc. LEXIS 528 (Ohio C.P. Aug. 20, 2010) ("The Court finds that Ohio law does not require a special relationship as an element of negligent misrepresentation.") Perhaps the clearest and most persuasive decision on this matter was cited by Hodell. In *National Mulch and Seed, Inc. v. Rexius Forest By–Products, Inc.,* 2007 WL 894833, 2007 U.S. Dist. LEXIS 24904 (S.D.Ohio, Mar. 22, 2007), the United States District Court for Ohio's Southern District explained as follows:

This Court agrees that a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law. Instead, as was stated *supra,* in order to assert a negligent misrepresentation claim under Ohio law, a plaintiff must establish that the defendant supplied false information for the guidance of the plaintiff in its business transactions, that the plaintiff was justified in relying on the information, and that the defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information. *Delman,* 41 Ohio St.3d at 4 [534 N.E.2d 835].

To the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for the guidance of the plaintiff in its business transactions. The "for the guidance of" language directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs. As explained by the Supreme Court of Ohio, liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." *Gutter v. Dow Jones, Inc.,* 22 Ohio St.3d 286, 288, 22 Ohio B.[R.] 457, 490 N.E.2d 898 (1986); *accord Haddon View,* 70 Ohio St.2d at 157 [436 N.E.2d 212] (not requiring any special relationship but limiting liability to misrepresentations made to a foreseeable class of persons). "A contrary result would in effect extend liability to all the world and not a limited class...." *Gutter,* 22 Ohio St.3d at 289 [490 N.E.2d 898].

Understanding this, a person may not maintain an action for negligent mis-

representation when the alleged misrepresentation is intended to reach an extensive, unresolved class of persons. Representations made to the public-at-large cannot result in liability. *E.g., id.* (newspaper reader not a member of a limited group of persons intended to benefit from representation in newspaper); *Amann v. Clear Channel Commc'ns, Inc.*, 165 Ohio App.3d 291, 298–99, 2006–Ohio–714, 846 N.E.2d 95 (2006) (radio station's general audience not a limited group); *Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 384–85, 738 N.E.2d 842 (2000) (investing public is an unlimited class of persons that cannot hold company's auditor liable for alleged negligent misrepresentations).

Conversely, liability may exist when the plaintiff is a person or member of a limited class of persons whom the defendant intends to benefit or guide with the information supplied. *See, e.g., Haddon View*, 70 Ohio St.2d at 157 [436 N.E.2d 212] (representation made to small group of limited partners); *Merrill v. William E. Ward Ins.*, 87 Ohio App.3d 583, 590–91, 622 N.E.2d 743 (1993) (beneficiaries of a life insurance policy were a foreseeable limited class intended to benefit from information supplied by insurance agent); *Sindel v. Toledo Edison Co.*, 87 Ohio App.3d 525, 528, 622 N.E.2d 706 (1993) (representation made to single customer of defendant electric company). All that is necessary is for " 'the maker of the representation [to] intend[ ] to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information.' " *Amann*, 165 Ohio App.3d at 299 [846 N.E.2d 95] (quoting Restatement (Second) of Torts § 552 cmt. h (1977)).

Thus, National Mulch can prevail on its negligent misrepresentation claim only if the alleged misrepresentations were intended to benefit or guide a group of persons with a definable limit, and National Mulch was a member of that group.

The determination of whether the plaintiff is a member of a limited class of foreseeable persons is dependent upon the factual circumstances of the representations made and the relationship between the parties. *See id.* at 298 [846 N.E.2d 95]. In this case, the alleged misrepresentations appear in marketing materials produced by Rexius. Certainly, the potential exists for these materials to be seen by a large, limitless group of people. However, it is undisputed that Rexius sent the materials directly to National Mulch via mail in response to the latter party's interest in the Rexius trucks. * * * Further, National Mulch has put forth evidence that the alleged misrepresentations were made to it orally as well. * * *

Viewing the facts in a light most favorable to National Mulch, it cannot be said that as a matter of law National Mulch was a member of a faceless or unresolved class of persons. Instead, reasonable minds could conclude that National Mulch was a member of a limited class of foreseeable persons that might rely upon the representations made. The marketing materials and oral representations were specifically directed to National Mulch. Although the marketing materials could eventually be disseminated to an indefinite number of persons, these representations were intended to reach and influence particular persons: National Mulch and its principals.

*Id.* at **9–10, 2007 U.S. Dist. LEXIS 24904 at **30–35 (footnotes omitted).

This Court finds the *National Mulch* decision to be more persuasive than the decisions cited by SAP. Furthermore, the Court further finds that the *National Mulch* decision is sufficiently analogous to the facts herein to preclude summary judgment. As discussed above, there is sufficient evidence of record from which a reasonable juror could find that SAP made a knowingly false or reckless representation, both through its marketing literature and through information allegedly supplied through LSi/IBIS. The evidence is further capable of supporting the conclusion that SAP knew that its representations were being transmitted directly to Hodell, and, therefore, were not made to an extensive, unresolved class of persons. As such, there is sufficient evidence of record to satisfy the requisite lower standard for negligent misrepresentation (*i.e.* that SAP failed to exercise reasonable care or competence in communicating information about its B1 software to Hodell.) Furthermore, there is sufficient evidence that would allow a jury to reasonably find that these communications were made in the course of a transaction in which SAP had a pecuniary interest.

Therefore, it is recommended that SAP's motion for summary judgment as to the negligent misrepresentation claim be denied.[14]

### C. Parol Evidence Rule and Integration/Merger Clause

SAP asserts that the License Agreement precludes all of Hodell's tort claims. (ECF No. 110–1 at 11–19.) Specifically,

SAP asserts that the alleged misrepresentations were not *collateral* to the agreement, and that the agreement's integration/merger clause, contained in Section 11.9 and quoted below, bars Hodell from arguing that contrary representations were made. *Id.* at 14–17. Notably, SAP made a virtually identical argument in its earlier motion to dismiss. (ECF No. 36–1 at 8–11.) In the previous Report and Recommendation, the Court addressed this argument as follows:

In a related argument, SAP claims that the parol evidence rule and the integration clause contained within the License Agreement combine to bar Hodell's fraud, fraud in the inducement, and negligent misrepresentation claims. (Doc. No. 36 at 8–12, 15–16.) The License Agreement contains the following provision:

This Agreement and each Schedule and Appendix hereto constitute the complete and exclusive statement of the agreement between SAP and Licensee, and all previous representations, discussions, and writings are merged in, and superseded by, this Agreement. This Agreement may be modified only by a writing signed by both parties. This Agreement and each Appendix hereto shall prevail over any additional, conflicting, or inconsistent terms and conditions which may appear on any purchase order or other document furnished by Licensee to SAP.

(Compl., Exh. G § 11.9.)

---

**14.** During oral arguments, SAP suggested that a negligent misrepresentation cannot set aside a contract, herein the License Agreement. (Oral Arguments Tr. 23–29.) In essence, counsel argues that because the amount of damages recoverable under negligent misrepresentation might be circumscribed by contract, the two actions cannot coexist. *Id.* This argument was not raised in the motion for summary judgment. Nonetheless, SAP has not cited any law suggesting that the two actions cannot coexist. Assuming *arguendo* that damages recoverable for negligent misrepresentation might be limited by the License Agreement, it does not follow that the cause of action cannot be maintained.

In *Galmish v. Cicchini*, 734 N.E.2d 782, 90 Ohio St.3d 22 (Ohio 2000), the Ohio Supreme Court conducted a thorough analysis of the relationship between claims of fraud and the parol evidence rule.

The parol evidence rule states that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." 11 Williston on Contracts (4 Ed.1999) 569–570, Section 33:4.

\* \* \*

The principal purpose of the parol evidence rule is to protect the integrity of written contracts. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 440, 662 N.E.2d 1074, 1080. By prohibiting evidence of parol agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments. "It reflects and implements the legal preference, if not the talismanic legal primacy, historically given to writings. It effectuates a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document." (Footnotes omitted.) 11 Williston on Contracts, supra, at 541–548, Section 33:1.

Nevertheless, *the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement.* Drew v. Christopher Constr. Co., Inc. (1942), 140 Ohio St. 1, 23 Ohio Op. 185, 41 N.E.2d 1018,

paragraph two of the syllabus. *See, also, Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S. (13 Wall.) 222, 231–232, 20 L.Ed. 617, 622. As explained in Annotation, Parol–Evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract (1928), 56 A.L.R. 13, 34–36: "The principle which prohibits the application of the parol-evidence rule in cases of fraud inducing the execution of a written contract \* \* \* has been regarded as being as important and as resting on as sound a policy as the parol-evidence rule itself. It has been said that if the courts were to hold, in an action on a written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.

"*Fraud cannot be merged;* hence the doctrine, which is merely only another form of expression of the parol-evidence rule, that prior negotiations and conversations leading up to the formation of a written contract are merged therein, is not applicable to preclude the admission of parol or extrinsic evidence to prove that a written contract was induced by fraud." (Footnotes omitted.)

Stated differently, *"it was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing*

*and formally executed, and thereby deprive the courts of the power to prevent him from reaping the benefits of his deception or chicanery."* (Footnotes omitted.) 37 American Jurisprudence 2d (1968) 621–622, Fraud and Deceit, Section 451.

Contrary to [defendant's] assertions, this principle does not lose its force merely because the considered written agreement contains an integration clause. The parol evidence rule applies, in the first instance, only to integrated writings, and an express stipulation to that effect adds nothing to the legal effect of the instrument. The presence of an integration clause makes the final written agreement no more integrated than does the act of embodying the complete terms into the writing. Thus, *the presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud. See Blackledge v. Allison* (1977), 431 U.S. 63, 75, 97 S.Ct. 1621, 1630, 52 L.Ed.2d 136, 148, fn. 6; *Downs v. Wallace* (Ala.1993), 622 So.2d 337, 341; Annotation, *supra*, 56 A.L.R. at 56–62; 37 American Jurisprudence 2d, supra, at 622–623, Section 452; 11 Williston on Contracts, supra, at 661–673, Section 33:21.

\* \* \*

Thus, *"the rule excluding parol evidence of collateral promises to vary a written contract does not apply where such contract is induced by promises fraudulently made, with no intention of keeping them * * *."* 37 American Jurisprudence 2d, supra, at 623, Section 452. However, *the parol evidence rule does apply "to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either indepen-dent of or consistent with the written instrument, evidence thereof is inadmissible." Alling v. Universal Mfg. Corp.* (1992), 5 Cal.App.4th 1412, 1436, 7 Cal.Rptr.2d 718, 734. By the same token, "if the written contract provides for the doing of an act on a certain condition, the promisee cannot show that the promise was an absolute one merely by claiming fraud, unless he produces some other evidence of the alleged fraud." Annotation, *supra*, 56 A.L.R. at 47–48.

*Id.* at 788–790 (emphasis added).

The Ohio Supreme Court's analysis in *Galmish* is fatal to SAP's position. Hodell alleges that SAP represented its Software could at least accommodate the 80 licenses contemplated in the Development Agreement and the additional 40 licenses purchased at the time the License Agreement was signed. This representation is not inconsistent with any provision of the License Agreement. Hodell has further alleged that SAP knew of the falsity or was, at the very least, reckless in making such representation. Had the License Agreement stated that the Software could only handle thirty users, or that SAP did not make any representations or guarantees as to the number of users the Software could handle, the parol evidence rule might well bar evidence of contradictory terms. Here, however, if it is true that SAP falsely represented the number of user licenses the Software could handle—and the Court must construe such allegations as true on a 12(b)(6) motion—then arguably both agreements were induced by promises fraudulently made that SAP had no intention of keeping or, more appropriately, had no ability to keep.

(ECF No. 50 at 22–25) (footnotes omitted).

Previously, the Court specifically found that the representations as to the number

of users the B1 software could accommodate was "not inconsistent with any provision of the License Agreement." (ECF No. 50 at 25.) In other words, the representations were indeed collateral to the License Agreement and did not represent contrary terms. Notably, that portion of the report and recommendation, quoted above, was **not** objected to by SAP. (ECF No. 52.) Rather, SAP's objections focused on the Economic Loss Doctrine—a distinct and separate issue. *Id.* The Court sees no reason to revisit this finding, as it is based on legal rather than factual issues and, therefore, largely unaffected by discovery. In its current motion, SAP asserts that discovery has revealed that it made no false representations to Hodell prior to the 2005 License Agreement. (ECF No. 110–1 at 15.) However, the Court has found, based on the evidence discussed above, that reasonable jurors could decide otherwise.

Finally, even if the Court found that the representation as to the number of users was not collateral and was rather contrary to the License Agreement, such a finding would only bar the fraud-in-the-inducement claim as to the License Agreement. SAP could still be held liable for fraudulently inducing Hodell into entering into the Development Agreement, notwithstanding the Court's finding that SAP was not a party to that agreement. In fact, as noted in the Court's previous report and recommendation, SAP has conceded that a defendant may be liable for fraudulent inducement even though it is not a party to the relevant agreement. (ECF No. 50 at 18; ECF No. 51 at 26, 52–54.)

### D. Breach of Contract–The License Agreement

■ Hodell's claim for breach of the Development Agreement entered into on or about December 20, 2004 was previously dismissed as to SAP. (ECF Nos. 50, 61.) The claim for breach of the License Agreement was dismissed with respect to Defendant SAP AG only. *Id.* Defendant SAP America now moves for summary judgment with respect to Hodell's claim for breach of the License Agreement. (ECF No. 110–1 at 36–39.)

In the Amended Complaint, Hodell alleges the breach of implied warranties and of an express warranty. (ECF No. 26 at ¶¶ 72–85.) Specifically, Hodell asserted that the Development Agreement contained an implied warranty of merchantability and an implied warranty of fitness for a particular purpose. *Id.* at ¶ 82. The breach of that agreement, however, is no longer an issue with respect to SAP. The Amended Complaint does not allege that the *License Agreement* contains an implied warranty of merchantability and/or an implied warranty of fitness for a particular purpose. *Id.* at ¶¶ 72–85. Hodell's brief in opposition appears to concede this point, as it does not argue that SAP breached an implied warranty. (ECF No. 162 at 46–49.) Nonetheless, the Amended Complaint also alleges a violation of an express warranty contained in the License Agreement:

> In the event that Hodell–Natco should be deemed to be bound by the terms of the SAP Business One Software License Agreement for the December 2005 purchase of 40 "CRM" user licenses, then Plaintiff alleges that the warranty set forth in paragraph 7.1 was breached as the software did not substantially conform to the functional specifications contained in the "documentation."

(ECF No. 26 at ¶ 84.)

In its brief, Hodell argues that it will offer evidence that SAP breached the express warranty, that the warranty "failed its essential purpose," and that SAP breached the covenant of good faith and fair dealing implied in every contract. (ECF No. 162 at 46–49.) The express

warranty contained in the License Agreement reads as follows:

7.1 *Warranty.* SAP warrants that the Software will substantially conform to the functional specifications contained in the Documentation for six months following delivery. The warranty shall not apply: (i) if the Software is not used in accordance with the Documentation; or (ii) if the defect is caused by a Modification, Integration Add–On, Licensee, third-party software, or third-party database. SAP does not warrant that the Software will operate uninterrupted or that it will be free from minor defects or errors that do not materially affect such performance, or that the applications contained in the Software are designed to meet all of Licensee's business requirements.

(ECF No. 110–12, Ex. K)

SAP asserts that Hodell cannot offer any evidence that B1 did not conform to the functional specifications supplied by SAP. (ECF No. 110–1 at 38.) Hodell disagrees and relies on the following evidence:

- Dan Kraus, Director of the B1 channel for SAP America, sent an email on February 18, 2007—prior to the March 2007 "go-live" date—asking that Hodell receive credit for maintenance expenses incurred in 2006 and to have such credit applied to maintenance expenses for 2007. (ECF No. 155–52, Exh. 253, ECF No. 128, Kraus Dep. at 89–90.)

- In his deposition, Mr. Kraus testified that Hodell was working on issues it had experienced with the software in 2006. (ECF No. 128, Kraus Dep. at 89–90.)

- Mr. Kraus's email stated that "[i]f [Hodell] had requested the return of

software due to inability to conform to documentation, we likely would have been obligated to honor the request." (ECF No. 155–52, Exh. 253.)

- When asked what "documentation" he was referring to, Mr. Kraus stated that he meant "[t]he documentation in the software that talks about the functionality in terms of how it performs." (ECF No. 128, Kraus Dep. at 90.)

The above evidence is sufficient to allow reasonable jurors to conclude that SAP breached the express warranty of the License Agreement by B1's failure to conform to the functional specifications contained in the documentation. Furthermore, Mr. Kraus's deposition testimony and email could support the inference that these problems arose within the first six months, as he stated that Hodell began experiencing issues in 2006. SAP asserts that it was not notified of any defect within six months of delivery. (ECF No. 110–1 at 39.) However, the License Agreement merely refers to the six month period for which B1 will substantially conform to the functional specifications contained in the documentation. As such, genuine issues of material fact remain as to whether SAP breached the License Agreement.[15]

### IV. Conclusion

It is recommended that the SAP defendants' Motion for Summary Judgment (ECF No. 110) be DENIED.

Filed June 13, 2013.

---

**15.** In the interests of judicial economy, the Court will not address at this time whether the express warranty "failed its essential pur-

pose" or whether SAP breached the covenant of good faith and fair dealing.